2011 5083. Mr. Leach. Thank you, Your Honor, and may it please the Court. Three issues are central to this appeal. First, whether a white non-governmental employee is within the coverage of the treaty provisions. Second, whether this Court's statement in Sosi v. United States in 1987 that, quote, any white can be a bad man, close quote, is holding or dictum. And finally, whether the treaty language, quote, any wrong, close quote, includes the unlawful killing of two innocent human beings. Well, Sosi clearly was a dictum, wasn't it? Because the offender there was a representative of the United States government. It was not, Your Honor, because to reach the conclusion that that language, the issue in Sosi is whether the Federal Tort Claims Act preempts the bad man among the whites paragraph. To decide that it does not, this Court has to analyze the two and says the bad man among the whites paragraph is broader because, number one, it covers assaults and batteries, and number two, it includes events wrong committed by anyone, not just government employees. The courts don't just interpret statutes in general divorced from the specific facts of a case. I understand, Your Honor. And what I'm saying is that the conclusion that any white can be a bad man is an essential part of the Court's reasoning in that case in distinguishing, in explaining how the bad man among the whites clause is broader than the FTCA. What do you think the phrase subject to the authority of the United States means in the case? It means subject to the jurisdiction of the United States, Your Honor. I think I thought... It means subject to prosecution under criminal laws? Yes. That's consistent with the obligation the United States was undertaking later on in the paragraph to proceed to arrest and punish those people without the power to arrest and punish, then the United States would not have an obligation. Is that what you're saying? I was with you until your very last phrase, Your Honor. So we're saying if bad men among the whites subject to authority of the United States shall commit any wrong, the United States would then undertake to arrest and punish those people. So obviously if the United States doesn't have the authority to arrest and punish somebody, then the United States would not be obligated to do that. I agree. Theoretically, then, that would suggest that this clause only extends to those people who are subject to the authority of the United States in that sense, as opposed to interpreting the phrase to mean somebody who is acting on behalf of the United States. If I understand what you're saying, I agree. I think I understand. I mean, the argument has been made all along that, well, subject to the authority of the United States only extends to people who are employees, agents, or otherwise acting on behalf of the United States. But I'm not sure that's the right way to look at that phrase or whether there's a different way to look at that phrase. So I'm trying to find out what, trying to see what in this agreement or the legislative history that leads up to this agreement suggests a meaning for this phrase that makes some sense. Let me answer in two parts if I could. First, why I think that authority means jurisdiction. Those terms, as I see it, are essentially interchangeable. And as recently as November 14, 2011, in Duncan v. United States, this court used the two terms interchangeably, referring to, quote, authority, open parentheses, i.e., jurisdiction, close parentheses, close quote, and explaining why it had no authority here. Well, anyone who's in the country is subject to potential criminal jurisdiction, subject to the authority of the United States. But that isn't what this was intended to deal with, was it? Not in 1868, they weren't, Your Honor. Subject to the authority of the United States in 1868 excludes, I think, two groups of people. One is Indians with whom the United States had no treaty relations. They weren't subject to United States authority. But the second group is Indians of the same tribe on the reservation. We know that conclusively from United States v. Crow Dog in 1883 from the U.S. Supreme Court, because Crow Dog tells us that. Turning to the second group. Let me ask you a couple things. There's one thing that bothers me about your argument, and that is you translate this, and the government does, as white men. And the way I read this, it says bad men among the whites. And I have a lot of questions for the government about this, but I'll throw this out to you. There were a lot of people among the whites who were not white men. Why do you just limit it to white men? I don't. If this involved a black man, I'd be making a slightly different argument, but the perpetrator here is white. By happenstance? Yes, sir. Separately, subject to the authority of the United States as written in 1868 by William Three years before that, there were a bunch of people, the Confederate states, who said they weren't subject to the authority of the United States and went to war over it. And I think you have to be informed of the situation in discussing this argument. So I'd like you to be informed of that situation and discuss it. That is, I'm not sure that subject to the authority of the United States as Sherman is writing it, applying it in conjunction with, at peace therewith, isn't also looking at the fact that there could be wars in which people claim they were not subject to the authority of the United States. I think that's certainly conceivable, Your Honor. I just don't think it makes a difference in this particular case. And Judge Lynn, if I could return to the second part of my answer to your question about subject to the authority of the United States, does it mean officers, agents, and employees of the government? We know from the treaty itself it does not. Because in Article II of the treaty, the government promises that only certain people will come on to the reservation after this treaty is signed. And it names those people, I quote, officers, agents, and employees of the government, close quote, are the only people who may come on to the reservation after the treaty is signed, proving conclusively that the drafters of this treaty knew how to say officers, agents, and employees of the government when that's what they meant. And of course that's not the language in the bad men among the whites paragraph. The first clause is followed by comma or, et cetera. Under this court's decision in Terry v. Principi from 2004, the comma or, quote, effects a separation, close quote, between the two clauses, thereby making it unnecessary even to reach the second clause in this case. And in fact, in Soci, what this court essentially said is we don't really care what the definitive meaning of the second clause is because we resolved this question under the first clause, we got a white man. If I could turn finally to the third point that I'd like to argue, we've covered the second. The question raised by the government in its brief whether what happened here is within the meaning of, quote, any wrong. The answer to this question, again, is right in the language of the bad men among the whites paragraph because as you were adverting to earlier, Judge Lurie, it says that in the event of one of these wrongs, quote, the United States will, dot, dot, dot, cause the offender to be arrested and punished according to laws of the United States, et cetera. That language, offender, arrest, punish, is the language of the criminal law. People who commit crimes get, people who commit offenses get arrested and punished. People who don't commit such offenses don't. Thus, a breach of contract is not covered, a negligent tort is not covered, but a crime is covered. And I think there are two other parts of that language in that paragraph that tell us the same thing. The language, quote, any wrong, close quote. Any, not the most heinous, not solely capital offenses, but any wrong. And then finally, still in that same paragraph, in the language of it, the words that offenses against, quote, persons or property are covered. Well, if offenses against property are covered, then so too at a minimum must be the unlawful killing of two human beings because under any moral code, killing two human beings without cause is worse than an offense against property. Unless the court has other questions, I'll stop here for now. Thank you, Mr. Leach. We'll save your time. Mr. Bennett. Thank you. The governor. May it please the court, Sosi versus the United States did not decide two issues that are important. One, it didn't decide exactly who was covered by the bad men among the whites provision. And the second thing that it didn't decide is what is a wrong. Now, with respect to the first issue, plaintiffs argue that Sosi's statement concerning... Mr. Bennett, are you sticking with the statement of the issues of the case where you described this in the red brief as whether the bad men provision of the Fort Laramie Treaty obligates the United States to compensate members of the Sioux tribe for a wrong committed by a white man? It could be anybody. Our position, Your Honor, is that the phrase subject to the authority of the United States modifies whites and limits it to... So it would be only a white man who's subject to the authority of the United States by being an agent or employee or something like that. Or other representative of the United States. So a drunken soldier drives on to the Sioux reservation and runs down two people. They're within one of those two groups that you say have potential liability. Bad government employees and agents and members of other Indian tribes. But it turns out that drunken soldier is a black woman. You're saying that there's no coverage? No, she would, in fact, be covered because what the bad men among whites provision says is if a bad man among the whites or among other people subject to the authority of the United States, by virtue of being a soldier, that would bring her within the meaning of subject to the authority of the United States. She would be another person. In other words, bad men isn't literal. Almost in quotes. As in mankind. Yes, Your Honor. With, again, the caveat that they are subject to the authority of the United States. In other words, they're an employee... But what about the comma? The comma. Well, Your Honor raises an interesting point. Plaintiff's argument is that... Most questions from the bench are interesting. It's a general rule. I'll bear that in mind, Your Honor. What plaintiff argues is that the bad men among the whites provision, which is punctuated as follows. It says, if bad men among the whites, comma, or among other people subject to the authority of the United States. Now, plaintiffs argue that because there's a comma after whites, but not after other people, that therefore subject to the authority of the United States can only modify other people and does not modify whites. What's interesting to point out, however, is that plaintiffs don't make any attempt to reconcile the comma usage in the first paragraph, the bad men among the whites provision, with the comma usage in the bad men among the Indians provision, which the Kinshashunka case... In the Kinshashunka case, the Supreme Court told us that the two paragraphs have to be construed together. Now, if you take a look at the way the second paragraph is punctuated, it says, if bad men among the Indians shall commit a wrong or depredation upon the person or property of anyone, comma, white, comma, black, comma, or Indian, comma, subject to the authority of the United States and at peace therewith. Now, if plaintiffs were going to make a consistent argument about comma usage, what they would say is because there's a comma after Indian, that therefore subject to the authority of the United States and at peace therewith modifies anyone, white, black, and Indian. They don't make that argument, Your Honor. What they do is they concede on page six of their reply brief that subject to the authority of the United States and at peace therewith only modifies Indian. They say that it doesn't modify anyone or white or black. So, therefore, the fact that the comma usage between the bad men among the whites provision and the bad men among the Indians provision is inconsistent, suggests that plaintiffs are placing far too much stock in the placement of that comma. And this discussion also raises another important issue. Well, let me ask you a question. At page 31 of the red brief, the government asserts, as the lower court explained, the Doolittle Commission establishes that the white men who perpetrated wrongs against Indians were by and large United States soldiers. The report states that the Indians specifically complained about the United States military and so on. Then the red brief goes on to say at 32, in light of the treaty's legislative history, it is clear that the treaty only intended those employees, agents, and representatives of the United States argument that you're making. By legislative history, I believe what you mean is the Doolittle Commission report and Sherman's report. That's correct, Your Honor. Did you read the report? Yes, I did, Your Honor. Then you're aware that at pages three and four, General Pope says the Indians are rapidly decreasing in numbers by cruel treatment on part of the whites, both by irresponsible persons, I'm underlining, and government officials. That throughout, Carlton says wars with our pioneers and our armed forces, such as a statement from the most experienced officers of the army. Then there's another one. It's still in there at page five. In those wild regions where no civil law has ever been administered and where our military forces have scarcely penetrated, those adventurers are practically without law. That's not talking about anybody who's a soldier or an agent of the army, is it? There are instances in the reports that talk about incidents with those who appear perhaps not to have been government employees. I'm on council. They appear not to have been government employees? Okay, that were not government employees. But we agree with the lower court that if you take a sort of broad view of the legislative history, it's clear that what the Indians were most focused on and what they believed was primarily bringing about the wars between the United States and the Sioux were actions of the United States. Are you still willing to say to the court that the Doolittle report makes it clear that neither party was concerned with wrongs committed by anyone other than employees, agents, or representatives of the United States? Again, we believe that the Doolittle commission report, taken as a whole and read as a whole as the lower court did, suggests that the primary concern… The language I asked you was, makes it clear, if that's what you said. We believe that it makes it clear that the primary concern was the actions of the United States soldiers. That's not… Okay. I'm not going to argue back and forth with you. Neither party was concerned with wrongs committed by anyone other than those people. So you're backing away from that? To the extent that we suggested that you could not argue… That there were no instances in which there appeared to have been conflicts between the Sioux and those who were not United States soldiers. Yes, we are not maintaining that you could not find a single instance. But we're supposed to read ambiguities in favor of the Indians, are we not? Well, you are, Your Honor. But, I mean, again, first, when you take a look at the language of the statute, there's the apparent ambiguity of what is subject to the… Who are other people subject to the authority of the United States? When are we supposed to resolve ambiguities in favor of the Indians and when not? The Supreme Court reversed us a number of years ago when we resolved a tax question in favor of the Indians. And the Supreme Court said it doesn't apply in tax cases. Where does it apply? Well, there is the language of the Supreme Court saying that ambiguities must be resolved in favor of the Indians. But I think here… In what context? Well, as Your Honor pointed out, in a tax context, and I have to admit I was not familiar with that case, apparently it does not apply. I'm very familiar with it because I was reversed. I'm sorry to hear that, Your Honor. In this particular case, Your Honor, I think there are sort of various apparent ambiguities that upon further examination turn out not to be ambiguities. And, for instance, as I mentioned, the other people subject to the authority of the United States, which this court in the Sose case indicated… This court sort of threw up its hands and said, whatever that means, which is, of course, a concession that the court believed that that phrase was at least somewhat ambiguous. Then what the lower court did was the lower court went and it took a look at the legislative history. And, as I just mentioned, the lower court looking at the legislative history as a whole, and Judge Wallach pointed out that there are, in fact, instances in both reports in which it appears that there were incidents between the Sioux and those who were not employees, agents, or representatives of the United States. But the lower court found that on the whole, read as a whole, the report supported the idea that what they were primarily concerned with was wrongs that were committed by United States soldiers. So I think if that was the concern, why didn't the treaty say soldiers? And why should we interpret this language to mean something broader than soldiers, but narrower than any white? Well, I think what the lower court did here was instructive. Again, it took a look at the legislative history. And what it also found was important was that both the Indian Peace Commission and the Doolittle Commission sort of acknowledged the extreme difficulty, if not impossibility, of removing all causes of complaint. Do you have authority for that site, counsel? I mean, Colonel Custer is complaining before the Black Hills are invaded by gold miners, specifically him, he's complaining that the miners are coming on and he has to stop them because he's ordered to by the United States government. Well, what the Doolittle Commission, or what the Indian Peace Commission report says at page 42, Your Honor, is that in making treaties, it was enjoined on us to remove, if possible. So again, they're acknowledging that this may not even be possible. The causes of complaints on the part of the Indians, this would be no easy task. We have done the best we could under the circumstances. The best possible way then to avoid war is to do no act of injustice. When we learn that the same rule holds good with Indians, the chief difficulty is removed, but it is said our wars with them have been almost constant. The Doolittle Commission echoes, again, the idea that it would be difficult, if not impossible, to prevent these wars. And what it says at page 42. You know as a historical fact, though, that the United States specifically entered those orders to the Army to keep the miners out and to keep the white frontiersmen out of the reservation. That may be, Your Honor. But again, we're confined here by what the language of the treaty is and what the legislative history is talking about. And here, again, there's an acknowledgement by both the Indian Peace Commission and the Doolittle Commission that it would be difficult, if not impossible, to remove all possible causes of complaint. And that's what the lower court found compelling and what convinced the lower court that the United States did not undertake to assume responsibility for the actions of those with whom it had no relationship or were not subject to its authority, which means employees, agents, or representatives. It seems as though the court has a pretty firm handle on what our argument is with respect to the scope of the Bad Men and Women of White's provision. So I'd like to transition now and discuss that, point out that even if this court were to find that the Bad Men provision does render the United States liable for the actions of non-employees, plaintiffs still couldn't recover here because this isn't the type of wrong that's covered by the Bad Men among the Whites provision. Just hypothetically, if automobiles had existed, let's say somebody rode their horse onto the reservation and ran down a couple of folks while they were drunken riding, that wouldn't apply? It would not, Your Honor, if they were acting unintentionally and without malice. Now, what's interesting is that plaintiffs devote a great deal of time to talking in their briefs about the so-called legislative history. You would have made that argument to a war party in 1869. I think I would have, Your Honor, and here's why. If you take a look at both the Indian Peace Commission report and the Doolittle Commission report, what they both, tellingly, plaintiffs look at both of those and they can't cite even a single instance that's analogous to this one where you're talking about an accident. It's an accident with tragic consequences, but it was an unintentional act committed without malice. And what's very interesting is that plaintiffs criticized the Doolittle Commission report in their reply. They say that its appendix is so full of unedited data that examples are bound to fit almost any theory. Yet they couldn't find even a single example to support the idea that what the Sioux and the United States thought were the type of actions that were going to bring about war between the United States and the Sioux were accidents or were unintentional crimes committed without malice. When they do talk about the legislative history and they talk about the Doolittle Commission report, on pages 11 and 12 they talk about the aggressions of white men. On page 14 they cite a portion of the report discussing white men striking or sometimes shooting the Indians. And on page 14 they talk about the tribes being excited to hostility by the unprovoked and outrageous shooting of their people. And you think those folks weren't liquored up from time to time? They may have been, Your Honor, but what they were doing was intentionally terrorizing the Indians. There's pretty compelling testimony that the lower court cites in its opinion from a chief of the Yankton Sioux who testified before the Doolittle Commission report and he talked about drunken soldiers, but he said that they were terrorizing Sioux women and they were firing their weapons into the Sioux' houses and lodges. Those were acts that were committed with malice. And I would argue that shooting into somebody's house, you're acting intentionally and trying to either kill the person in the house or terrorize them. These are acts of a fundamentally different nature than what we have here. What we have here is an accident with tragic consequences. But Mr. Hotz, he didn't commit this crime intentionally. He didn't commit it with malice. He made a tragic mistake. I'm sorry, but the history of the United States is rife with alcohol-caused crimes relating to the American Indians. And you're just walking away from that history and I just don't get it. I don't believe I am, Your Honor. Again, what we're looking at is the purpose of this treaty and what both sides envisioned. And what they said, this treaty was supposed to bring about peace between the United States and the Sioux. And logically, as the court explained in the Hernandez case, the wrongs contemplated by the bad men provision or acts that would have threatened the peace that the Fourth Army Treaty was designed to protect. Well, the Doolittle Commission Report is filled with hundreds of pages chronicling the complaints of the Indians. And again, there's just no complaint in there and plaintiffs have been unable to identify one where they're complaining about an act that was truly an accident, something that was committed unintentionally and without malice. Thank you, Mr. Bennett. Your time has expired. Mr. Leach has some rebuttal time. Thank you, Your Honor. Let me ask you, Mr. Leach. I'm sorry? Yes. Has there been an appellate court decision which has applied this treaty to find the United States liable when the wrong has been committed by a non-employee or soldier of the United States government? No. In other words, we've got more than, we've got 150 years of the existence of this treaty and the holding that you're asking for has never taken place before. That's true. And I'd like to address, you know, the implicit question is why. Is that almost a stare decisis situation? No. No, Your Honor. Any more than in Soce. I mean, Soce says it's not obsolete, it's not preempted, it's still alive. And it's still alive in 1987. It's alive today. But your implicit, I think the implicit question is why have there been no such cases? And the only answer is I don't know. That's the truth. The government posits that there must have been some kind of shared understanding that non-government employees were excluded. But there is absolutely no evidence in support of that. If there were an understanding, there would be a larvae article somewhere, there would be a treatise somewhere. I mean, everyone who had a shared understanding of the 1868 treaty was dead by 1987 when Soce comes along. Moving to three points that came up during the government's argument. First, the government accuses us of being inconsistent in our treatment of the commas between the first paragraph, which is what we're talking about, and the second paragraph, which we're actually not, which is not an issue. But even if you look at the second paragraph, what you've got in the second paragraph is white comma, black comma, or Indian comma, subject to the authority of the United States and at peace therewith. So the commas are serving a different function in paragraph two. They're separating a series of objects, thus bringing into play the so-called doctrine of the last antecedent. Have you looked at the original handwritten treaty? No, Your Honor. Well, you may be interested to know, and I have a copy of the page that has the article in it, the article we're discussing, that the comma happens to be in a different place. It says, if bad men among the whites or among other people, comma, subject to the authority of the United States, et cetera. So the criticality of the placement of the commas would seem to be a poor argument at best. In light of what you just read me, if that's the accurate original text, it's news to me, but if that's the case. It came from the Internet, so it has to be accurate. And while you're talking about it, since you don't know anyway, but speculate on whether the legislature changed it intentionally when they did the printed version. I don't know, Your Honor. Of course you don't. The second point that came up during the government's argument is the government keeps calling this an accident, a mere accident. Well, that would be great news to the United States Attorney for the District of South Dakota, who did not consider this an accident, and to the defendant and his attorney who pled guilty to this crime involving the wanton or reckless disregard for human life. Finally, Judge Wallach, I don't know that it matters in this appeal, but I just wanted to give you my thoughts on what you raised about blacks and women within the scope of, or women especially within the scope of bad men among the whites. I don't know whether women are covered within, quote, bad men among the whites, close quoting. 1862 in the Emancipation Proclamation, Lincoln used the term men, and I think he probably meant people. But whatever, women and everyone else is certainly covered by the, or among other persons subject to the authority of the United States. Thank you, Mr. Leach. We'll take the case under advisement. Thank you very much, Your Honor.